**In re CITY OF DETROIT, Detroit Water and Sewerage Department, Petitioners.**

No. 85–1894.

United States Court of Appeals,
Sixth Circuit.

Argued May 1, 1986.

Decided Sept. 17, 1987.

Abigail Elias (argued), Martha L. Black, Detroit, Mich., for appellant.

Frederick M. Baker, Jr., Willingham, Coté, Hanslovsky, East Lansing, Mich., for Snell Environmental Group.

David Sims, U.S. E.P.A., Region V, Chicago, Ill., Richard J. McClear, Dykema, Gossett, Spencer, Goodnow & Trigg, Kathleen Gallagher Lewis, James A. Smith, David Vago, Thomas A. Neenan, Wayne County Bd. of Public Works, Detroit, Mich., William P. Hampton, Davidson, Gotshall, Kohl, Secrest, Wardle, Lynch & Clark, Farmington Hills, Mich., Thomas F. Schimpf, Asst. Atty. Gen., Lansing, Mich., Robert H. Fredericks, Chief Deputy Drain Comm., Pontiac, Mich., for appellee.

Joseph B. Klein, Asst. Wayne County Pros. Atty., John P. Williams, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., James F. Graves (argued), Willingham, Cote, Hanslovsky, Griffith & Foresman, P.C., East Lansing, Mich., Marty Black, Deputy Corp. Counsel, Detroit, Mich., L. Michael Wicks (argued), U.S. Atty., William Dietrich, Wayne County Asst. Corp. Counsel, Detroit, Mich., John Michael Donohue (argued), Farmington Hills, Mich., for respondents.

Before NELSON and RYAN, Circuit Judges, and BROWN, Senior Circuit Judge.

PER CURIAM.

The City of Detroit, Michigan, and its water and sewerage department have petitioned this court for a writ of mandamus that would require the former Chief Judge of the United States District Court for the Eastern District of Michigan to recuse himself in two pending cases that arose out of the city's waste water treatment operations. Because the refusal of a trial judge to disqualify himself is not ordinarily subject to review by way of mandamus, and because we are satisfied that the judge in this case did not abuse his discretion in refusing to recuse, we shall deny the petition.

I

The cases in question are *United States, et al. v. City of Detroit, et al.*, Civil Action No. 77–71100 (E.D.Mich.), and *Snell Environmental Group, Inc. v. City of Detroit*, Civil Action No. 84–CV–3798–DT (E.D. Mich.). The former is a proceeding initiated by the United States Environmental Protection Agency against the City of Detroit and others to obtain compliance with the Federal Water Pollution Control Act; the latter is a contract action brought against the city by a company that performed design and construction services for the city in connection with a certain sludge processing facility. The EPA's suit was assigned to the then Chief Judge of the Eastern District of Michigan, the Honorable John Feikens, by blind draw. The *Snell* case was initially assigned to another

judge, but was then reassigned to Judge Feikens pursuant to Rule 8(c) of the district court's local rules.

Soon after the filing of the EPA action in 1977, the district court entered a consent judgment under which the city assumed a variety of obligations with respect to the financing, staffing, operation and maintenance of waste water treatment facilities and related sludge disposal facilities. In the latter part of 1978, contending that the city had failed to comply with the consent judgment, the EPA applied to the court for appointment of an outside receiver of the water and sewerage operation. The court ultimately entered an order appointing the Mayor of Detroit, Mr. Coleman A. Young, "administrator" of the Detroit water and sewerage department for the purpose of carrying out the city's obligations under the 1977 consent judgment. The administrator was given broad authority to manage the department, including authority to enter into contracts without following competitive bidding procedures. The order also directed Mayor Young, as administrator, to procure the services of an experienced waste water treatment plant manager to assist him in carrying out his responsibilities.

Mayor Young served as administrator, pursuant to court order, until December 11, 1984. The administratorship was dissolved as of that date, pursuant to a motion for dissolution in which the city and Mayor Young, as administrator, represented that the city had met the water effluent requirements of the consent judgment and had otherwise demonstrated its ability to achieve compliance with the requirements of that judgment. Substantial improvements were made in the city's waste water treatment operations during the period of Mayor Young's administratorship, and Judge Feikens personally played a very active role in overseeing the operation of the system. Notwithstanding that Mayor Young was the *de jure* administrator, Judge Feikens referred to himself, on occasion, as the system's "receiver."

As a result of certain *ex parte* conferences, Judge Feikens determined in February of 1983 that the department should construct a sludge mixing facility on the premises of the city's waste water treatment plant. On March 23, 1983, the court entered two orders directing Mayor Young, as administrator, to have the department negotiate a contract with Snell Environmental Group for construction of a 2,000–ton-per-day sludge processing facility at an estimated cost of $1.2 million. The orders specifically directed that the contract be negotiated rather than being awarded through competitive bidding. The orders also directed Mayor Young, as administrator, to have the department "investigate the availability of appropriately licensed landfill sites which will accept sludge ... and to further explore the availability of haulers to convey sludge from the Waste Water Treatment Plant to said sites."

The city negotiated a contract with Snell, as directed, and Snell designed and managed the construction of a sludge processing facility at the treatment plant. A controversy subsequently arose between Snell and the city as to the amount due Snell under the contract, and Snell filed suit. The city filed an answer and counterclaim and demanded a trial by jury. Although the case is thus at issue, no trial date has been set. Counsel advised us at oral argument that the questions that are to be litigated in the *Snell* case do not involve matters in which Judge Feikens was personally and directly involved.

On February 3, 1983, at about the time of the *ex parte* conferences that led to issuance of the order directing the negotiation of a contract with Snell, the director of the department and others involved in the hauling of sludge from the treatment plant to a disposal site were indicted under the Federal Racketeer Influenced and Corrupt Organizations Act. These indictments were based on information that the FBI had obtained in wiretaps that had been authorized by Judge Feikens. The criminal proceedings culminated in the conviction of the director and others. See *United States v. Bowers*, 828 F.2d 1169 (6th Cir.1987).

On August 26, 1984, the *Detroit Free Press* published an article based on an in-

terview in which Judge Feikens had discussed the administratorship of the department at considerable length. In the interview, he explained why he had appointed Mayor Young as administrator, described the sad state the department had been in when the administratorship began, and noted the accomplishments that had been achieved with the court's assistance-under the administratorship.

In the course of telling the reporter why he considered the administratorship a success, the judge observed that "there are some people, I don't care how good they are, [who] just don't know how to [get from A to B.]" One such person, he went on to suggest, was former Governor George Romney, in whose presidential campaign the judge was involved before he was appointed to the bench. Repeating a remark attributed to Theodore White, the judge said that Romney didn't make it "because he couldn't climb the hill." He suggested that many black people, like Governor Romney, could not "climb hills," and had to be given "the time to ... learn how to run City governments, to run projects like the water and sewer plant. Unfortunately, they're still in an area of development, many of them, in which they think all you have to do is talk about this thing. So you hear a lot of rhetoric. Talking is important; words are important. But you have to do more than just talk about it.... [A]s the black people come into political power in all the big cities of the United States, they have to learn how to climb hills. Some won't. Some will not understand how to run government. Some will not understand leadership."

In response to the question "Do you think Mayor Young understands how?" the judge replied: "He does in certain areas. But he's a very poor administrator. I don't mean now as a person in the water and sewer plant because he was surrounded by enough people that were doing good jobs. But I mean just generally, his staff work over there is lousy." The judge added that "It may be that he doesn't take the time to inform himself; it may be that he doesn't do the homework. But on so many things that happen that I've seen, he just doesn't have a grasp of it." The reporter noted that many members of the city administration had stated that the Mayor was actively involved in the day-to-day operation of the city's departments, but the judge replied that he saw "no evidence of that" in the water and sewer department and said that he didn't "know about his other departments."

The published article that resulted from this interview highlighted the judge's derogatory comments on Mayor Young's administrative skills and the generalizations about black people.[1] Mayor Young, according to the article, declined comment.

On November 14, 1984, the city moved to disqualify Judge Feikens in the *EPA* and *Snell* cases pursuant to 28 U.S.C. §§ 144 and 455.[2] The motion was supported by an

1. As a result of the article, the Wolverine Bar Association and other community groups filed complaints with the Judicial Council of the Sixth Circuit, stating that the Judge made "racially patronizing and biased" comments "which can reasonably be interpreted as stating that black people generally are not qualified to govern municipalities and municipal projects such as the [Detroit Waste Water Treatment Plant]." On December 5, 1984, a committee of the Judicial Council recommended dismissal of the complaints, observing that "though Judge Feikens made an untrue and regrettable statement in the course of the interview, the full transcript demonstrates that he had no intention of denigrating black people generally. The treatment by the newspaper of a single sentence from a lengthy interview led to the perception honestly expressed in the complaints. However, the Committee is convinced that this treatment is inconsistent with the general tenor of the interview and with the well known and documented concern of Judge Feikens for racial justice."

2. 28 U.S.C. §§ 455(a) and (b) state in relevant part:

"(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

....

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest

affidavit suggesting that the judge's statements to the press "have been viewed by members of the public as showing his bias or prejudice against Mayor Coleman A. Young and other City officials and personnel, including those at the Detroit Water and Sewerage Department, if not a more general bias or prejudice against black people...." The affidavit further suggested that the judge had been functioning as "an active, nonjudicial 'receiver' in the management and supervision of the operations of the DWSD," citing instances in which Judge Feikens had said such things as "I am in charge of this plant" and "I think, as Judge in this case, I can act as Receiver...." The affidavit also noted that "Judge Feikens has had active *ex parte*, non-judicial negotiations and communications with potential sludge disposers or haulers ... which resulted in the selection of Snell as the design and construction contractor of the on-site sludge processing facility ... [and] indicate a personal bias or prejudice toward the City of Detroit and its political representatives."

By an order dated April 5, 1985, the judge denied the city's motion to disqualify, citing reasons elaborated in decisions denying other disqualification motions. See, *e.g., United States v. Wayne County Department of Health-Air Pollution Control Division,* 571 F.Supp. 90 (E.D.Mich. 1983). The city moved for reconsideration, and Judge Feikens denied the motion in a 21–page opinion and order dated August 19, 1985.

Insofar as the disqualification motion was based on the *Detroit Free Press* interview, the court observed that "assuming for the sake of argument that my statements do reflect a view that city officials have not been competent," the city's argument

"provides no plausible basis for concluding that the views expressed in the interview were based on extrajudicial information. Defendant has alleged no facts that might convince a reasonable man that those views were not formulated during the course of eight years of judicial proceedings concerning [the city's] treatment of sewerage. Absent such specific allegations of bias derived from an extrajudicial source, disqualification clearly is not appropriate. See *United States v. Bobo,* 586 F.2d 355, 366 (5th Cir.1978)...."

With regard to the allegation that he had obtained information through improper *ex parte* activities, the judge stated that

"[i]n exercising its supervisory responsibility over a receivership a court's action must be flexible and broad in order to meet the requirements of the situation. *Spence v. Reeder,* 382 Mass. 398, 416 N.E.2d 914, 924 n. 15 (1981) (summarizing views of various scholars). In this case, this supervisory role has sometimes

in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

....

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding."

28 U.S.C. § 144 states:

"Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

"The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

Although § 144 on its face appears to require automatic disqualification once the affidavit is filed, a district court judge has a duty to examine the affidavit to determine whether it is timely and legally sufficient. *Berger v. United States,* 255 U.S. 22, 32, 41 S.Ct. 230, 232–33, 65 L.Ed. 481 (1921). An automatic disqualification would constitute a grant of a peremptory challenge, and Congress has failed to enact proposals to grant peremptory challenges. 13A Wright, Miller & Cooper, *Federal Practice and Procedure,* § 3541 at 553–54.

required me to obtain information relevant to the receivership without first assembling all parties to this litigation. Defendant now suggests for the first time that procedures should have been followed which would, in reality, have forced me to abandon a meaningful supervisory role. I find this contention unsound and disqualification on this basis unwarranted."

With respect to the city's argument that he had become, in effect, a party in interest, the judge stated that his references to himself as "receiver" represented nothing more than "a shorthand reference to the Court's supervisory role over the receivership." The "interest" the court had by reason of its supervisory role over the receivership, the judge said, would not require disqualification. Finally, Judge Feikens found no merit in the argument that he would be required to testify as a witness in the *Snell* litigation because of the role he had played in the negotiation of the Snell contract.

Having thus failed to persuade the judge that he should disqualify himself, the city petitioned this court for a writ of mandamus requiring him to step aside. The city contends that Judge Feikens' failure to disqualify himself represents a clear abuse of discretion.

## II

■ We must first decide whether it is appropriate for us to review the recusal question now, rather than dealing with it when and if there is an appeal from a decision on the merits in either of the two cases.

In the *EPA* case, it is by no means clear that Judge Feikens will ever make any further substantive decisions. The only matters currently before him, we are informed by counsel, are cross motions on the adoption of implementation schedules for the fabrication and installation of additional air pollution control equipment. Those motions have been pending since

April 6, 1984. No one is pressing to have them decided, and it is at least questionable whether they ever will be decided. The city has conceded that if Judge Feikens should be called upon to render further decisions on substantive matters, his decisions will be subject to review on appeal.

We would also note that most of the facts the city has cited in its effort to show bias on the part of Judge Feikens were known to the city at the time it was ordered to enter into a contract with Snell. Most of the allegedly improper *ex parte* conduct had occurred by then also. If the city believed that the court's order to enter into the contract was tainted, it could have moved for reconsideration and recusal at that time. Had such motions been denied, the court's action could have been appealed pursuant to 28 U.S.C. § 1292(a)(1).[3] See 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure* § 3922 at 45–46. Against this background we are not overly impressed by the city's argument that it had to seek mandamus "[b]ecause of the unusual procedural posture of [this case] and the unavailability of final appellate review."

As to the *Snell* case, it is entirely possible, for all we know, that the case will be settled, or will end with a judgment in favor of the city or a judgment that the city might not wish to appeal. It is the received wisdom in this circuit that the time for reviewing the action of a trial judge in refusing to disqualify himself is not while the case is pending in the trial court, but on appeal. *Collier v. Picard*, 237 F.2d 234, 235 (6th Cir.1956). This court has not been sympathetic to the notion that review of disqualification questions may be obtained through mandamus proceedings prior to the entry of any appealable order or final judgment.

In *Albert v. United States District Court for the Western District of Michigan*, 283 F.2d 61, 62 (6th Cir.1960), *cert. denied*, 365 U.S. 828, 81 S.Ct. 713, 5

---

**3.** Had the city been successful on appeal, the *Snell* litigation would not have been assigned to

Judge Feikens in the first place.

L.Ed.2d 706 (1961), we said that before a petitioner may resort to the extraordinary writ of mandamus, "he must establish that he has a clear and certain right and that the duties of the respondent are ministerial, plainly defined and peremptory." We noted that the extraordinary remedy of mandamus "does not lie to compel a judge of an inferior court to reverse a decision made by him in the exercise of a legitimate jurisdiction," *id.*, and we held that in ruling upon a disqualification motion "the consideration by the District Judge of the sufficiency of the affidavit of bias and prejudice is not a ministerial, but a judicial act." This court thus concluded that it would not be justified in issuing a writ of mandamus. 283 F.2d at 62–63. We followed *Albert* in *City of Cleveland v. Krupansky*, 619 F.2d 576 (6th Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980), interpreting *Albert* as holding that "mandamus was not the proper remedy to compel a judge to recuse himself." 619 F.2d at 578.

The city submits that we should now follow *SCA Services Inc. v. Morgan*, 557 F.2d 110 (7th Cir.1977), where the Court of Appeals for the Seventh Circuit deemed it appropriate to depart from its prior position that review of disqualification decisions may not be obtained in mandamus proceedings. Citing similar decisions from other circuits, and pointing out that the language of 28 U.S.C. § 455 has been changed since *Albert* was decided,[4] the city argues that we are no longer bound by *Albert*. As to *Krupansky, supra,* which was decided after § 455 had been amended, the city suggests that the decision is simply wrong and invites us to overrule it.

This we would decline to do even if, as a three-judge panel, we felt ourselves free to reverse an earlier decision of another three-judge panel. The legislative history of the 1974 amendment to 28 U.S.C. § 455 shows that "while the proposed legislation would adopt an objective test, it is not designed to alter the standard of appellate review on disqualification issues. The issue of disqualification is a sensitive question of assessing all the facts and circumstances in order to determine whether the failure to disqualify was an abuse of sound judicial discretion." H.R.Rep. No. 1453, *supra* note 4, at 6355. Professor Karen Nelson Moore, who wishes it were otherwise, has acknowledged that "[n]either the statutes nor their legislative histories indicate whether immediate appellate court review of district court disqualification decisions is appropriate." Moore, *Appellate Review of Judicial Disqualification Decisions in the Federal Courts*, 35 Hastings L.J. 829, 830 (1984).[5]

The decisions of the Supreme Court on the availability of immediate appellate review of judicial disqualification decisions have not seemed entirely consistent. Compare *Ex Parte American Steel Barrel Co.*, 230 U.S. 35, 33 S.Ct. 1007, 57 L.Ed. 1379 (1913) (mandamus denied), with *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (mandamus granted). The decisions of the Supreme Court on the use of the writ of mandamus, however, support the reasoning of this court in *Collier, Albert,* and *Krupansky*. Normally, a writ of mandamus is only available when an appeal of a final judgment would not provide effective relief; the writ will be granted only to confine a judge to his jurisdictional powers or to compel him to exercise his judicial authority. Mandamus is not the proper vehicle for correcting a garden-variety judicial error; the function of the writ, rather, is to check an abuse of judicial power. *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26–29, 63 S.Ct. 938, 941–43, 87 L.Ed.

---

4. As amended in 1974, § 455 uses an objective standard that requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Prior to 1974, § 455 contained a subjective standard whereby a judge was to disqualify himself if it was "improper, in his opinion for him to sit on the [case]." H.R.Rep. No. 1453, 93d Cong., 2d Sess. 4–5, *reprinted in* 1974 U.S.CODE & ADMIN.NEWS 6351, 6354–55.

5. Professor Moore urges Congressional action to require immediate appellate review of recusal decisions. She also urges federal appellate courts to allow for immediate review of questions that arise under §§ 455(b)(2)–(5). Congress has not acted, however, and the case at bar, like *Krupansky*, involves no claims properly cognizable under §§ 455(b)(2)–(5).

1185 (1943). Even when the requirements for issuance of the writ are satisfied, moreover, the decision to grant the writ is within the discretion of the appellate court. *Kerr v. United States District Court for the Northern District of California,* 426 U.S. 394, 403, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976).

This court has refused to allow immediate review of denials of judicial disqualification motions because of a strong belief in the values inherent in the "final judgment rule." At the time of regular appellate review, however, we have not hesitated to reverse judgments entered by a trial judge who improperly refused to disqualify himself on the ground of judicial bias. See, *e.g., United States v. Holland,* 655 F.2d 44 (5th Cir.1981); *Roberts v. Bailar,* 625 F.2d 125 (6th Cir.1980).

■ In any event, it is a tradition of this court that published decisions rendered by a three-judge panel of the court may only be reversed by the full court, sitting *en banc. Krupansky, supra,* would be controlling here whether or not this panel happened to agree with the result reached in that case.

## III

Even if we were prepared to entertain review of the trial court's decision by way of mandamus proceedings, we could not grant a writ of mandamus absent an abuse of discretion by the trial court. As the Court of Appeals for the First Circuit stated in a recent case:

"We ask not whether this court would have decided as did the trial court, but whether the trial court decision cannot be defended as a rational conclusion supported by a reasonable reading of the record." *In re Cooper,* 821 F.2d 833, 834 (1st Cir.1987).

■ In considering the "rationality" of the trial court's decision here, it is important to understand that petitioners' claims are cognizable only under 28 U.S.C. § 144 and §§ 455(a) and (b)(1). Petitioners argue that they come under § 455(b)(4), and §§ 455(b)(5)(iii) and (b)(5)(iv), but that is not correct. Section 455(b)(4) applies to a "fiduciary," a term that covers "such relationships as executor, administrator, trustee, and guardian." 28 U.S.C. § 455(d)(3). Although Judge Feikens may have called himself a "receiver," that is not what he was. Judge Feikens' interest as the judicial supervisor of a receivership is not the type of interest referred to in § 455(b)(5)(iii). Section 455(b)(5)(iv) would be applicable only if Judge Feikens is likely to be a material witness, which he is not. As the judge correctly noted in the district court opinion, he cannot be called upon to testify about facts inextricably intertwined with his mental processes in supervising the receivership. Petitioners' basic claims arise under 28 U.S.C. §§ 144 and 455(a) and (b)(1), and they are grounded on the judge's newspaper interview and his conduct as supervisor of the receivership.

■ Both § 144 and § 455 require that disqualification motions be timely; that requirement is explicit in the former section and implicit in the latter. *City of Cleveland v. Cleveland Elec. Illuminating Co.,* 503 F.Supp. 368, 378–381 (N.D.Ohio 1980). The timeliness requirement is not unrelated to other considerations pertinent to judicial disqualification decisions. As the legislative history of § 455 states:

"[I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice." H.R.Rep. No. 1453, *supra* note 4, at 6355.

Timeliness is a factor that obviously merits consideration by a court that is trying to determine whether a judge is truly biased

or a litigant is merely trying to avoid an impending adverse decision. *Cf. Krupansky,* 619 F.2d at 577.

■ The city's claims that Judge Feikens is biased because of his receivership role and because of his *ex parte* activities are not timely. These claims could have been raised two or three years earlier—which leaves us with the interview as the only timely basis for the § 144 and § 455 motions.[6]

■ The judge correctly decided that if his interview demonstrates that he holds negative opinions of Mayor Young's ability as an administrator, those opinions would not require his recusal if not formed as a result of extrajudicial activity. *Bradley v. Milliken,* 620 F.2d 1143, 1156–58 (6th Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980). In at least one type of situation analogous to ours, Congress has recognized that judges need not disqualify themselves on the basis of impressions formed in prior judicial activities:

"The question arose during consideration by the House Committee on the Judiciary, whether enactment of this provision would bar judges from dealing with summary contempts in open court before them. The Committee agreed that no such interpretation is warranted. The summary contempt procedure has been and remains an indispensible exception to the usual procedures and the bill would not affect it." H.R.Rep. No. 1453, *supra* note 4, at 6355.

Judge Feikens gave no indication in his interview that his views on Mayor Young were formed as a result of anything but his experience as supervisor of the receivership.[7]

■ Even if Judge Feikens is not actually biased, the city argues, he must recuse himself because of a supposed appearance of partiality. In this connection the city cites letters from two judges, two columns and an editorial from the *Detroit Free Press,* a complaint filed with the Sixth Circuit Judicial Council, and a *New York Times* article. In *In re International Business Machines Corp.,* 618 F.2d 923 (2d Cir.1980), however, the court held that an affidavit by five distinguished members of the Board of Directors of IBM (William T. Coleman, Jr., Carla Anderson Hills, John N. Irwin II, William W. Scranton, and Irving S. Shapiro) stating their belief that a judge "had a personal bias and prejudice and that his impartiality in the action may reasonably be questioned" was not legally sufficient to require the grant of a mandamus petition. Moreover, the letters and articles cited by the city do not necessarily mean that the public believes Judge Feikens is biased. The *Detroit Free Press* editorial, for example, stated that "nobody who knows the judge believes him guilty of a maligned racism." The Judicial Council has noted, similarly, that the complaints against Judge Feikens were "inconsistent with the general tenor of the interview and with the well known and documented concern of Judge Feikens for racial justice." Judge Feikens' statements clearly do not evince racial animus or hatred; patronizing they may be, but any bias they may seem to reflect is at least as likely to be in favor of Mayor Young and other black officials as against them.

---

6. If Judge Feikens was in fact functioning as the "*de facto*" administrator of the city's water and sewarage department while dealing with Snell, Snell might very well have been able to challenge Judge Feikens' impartiality as a judge presiding over the trial of Snell's lawsuit against the city pursuant to § 144 and § 455(a). We recognize that even though Snell is not seeking Judge Feikens' recusal, § 455 directs a judge to disqualify himself *ex mero motu* in any proceeding where his impartiality might reasonably be questioned. We do not share Judge Feikens' broad view of the propriety of a judge's engaging in *ex parte* conduct while he is a supervisor of a receivership. There are many dangers to the integrity and impartiality of the judicial system inherent in such *ex parte* conduct. See Resnick, *Managerial Judges,* 96 Harv.L.Rev. 376, 407–11, 426–31 (1982). However, under the standard (abuse of discretion) by which we review petitions for mandamus, these issues are not before this court.

7. In its brief, the city tries to portray the newspaper article as one of a chain of repeated instances since 1979 in which Judge Feikens has "shown a bias and lack of faith in the employees of the City of Detroit." Viewed in this light, the arguments based on the contents of the newspaper article are untimely.

The petition for a writ of mandamus is DENIED.