UNITED STATES of America,
Plaintiff-Appellee,

v.

Darralyn BOWERS, Defendant-Appellant (84–1105/1193/1736),

Darralyn Bowers and Vista Disposal,
Inc., Intervenors-Appellants
(84–1250),

Charles Beckham,
Defendant-Appellant (84–1737).

Nos. 84–1105, 84–1193, 84–1250,
84–1736 and 84–1737.

United States Court of Appeals,
Sixth Circuit.

Argued May 1, 1986.
Decided Sept. 17, 1987.
Rehearing and Rehearing En Banc
Denied Dec. 1, 1987.

N.C. Deday LaRene (argued), Detroit, Mich., for defendant-appellant in Nos. 84–1105, 84–1193 and 84–1736 and intervenors-appellants in No. 84–1250.

Kenneth M. Mogill (argued), Detroit, Mich., for defendant-appellant in No. 84–1737.

Joel M. Shene, U.S. Atty., Detroit, Mich., Christopher Andreoff, for plaintiff-appellee in Nos. 84–1105 and 84–1193.

Leonard R. Gilman, U.S. Atty., Detroit, Mich., Mark Werder, L. Michael Wicks, William B. Lazarus, Jacques B. Gelin, Appellate Section, Land & Natural Resources

Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee in No. 84–1250.

Christopher Andreoff (Lead Counsel), Asst. U.S. Atty., Detroit, Mich., Keith E. Corbett (argued), Maura D. Corrigan (argued), for plaintiff-appellee in Nos. 84–1736 and 84–1737.

Before NELSON and RYAN, Circuit Judges, and BROWN, Senior Circuit Judge.

PER CURIAM.

These cases come before us on appeals by Charles Beckham and Darralyn Bowers from criminal convictions for activities connected with the operation of the Detroit sewage treatment system. Mr. Beckham was convicted on one substantive R.I.C.O. count, 18 U.S.C. § 1962(c); seven Hobbs Act extortion counts, 18 U.S.C. § 1951; and four mail fraud counts, 18 U.S.C. § 1341. He was sentenced to twelve three-year terms of imprisonment, to be served concurrently, and was ordered to forfeit $16,675.00 in illegal payoffs. Ms. Bowers was convicted of one substantive R.I.C.O. count, 18 U.S.C. § 1962(c); one R.I.C.O. conspiracy count, 18 U.S.C. § 1962(d); and four mail fraud counts, 18 U.S.C. § 1341. She was sentenced to four years' imprisonment on each of the R.I.C.O. counts and two years on each of the mail fraud counts, all sentences to run concurrently.

Some of the evidence incriminating defendants Beckham and Bowers came from electronic surveillance authorized by United States District Judge John Feikens. The defendants challenge their convictions on the ground that Judge Feikens was not, as they allege, a "neutral and detached" judicial officer. The defendants' allegations are based in part on Judge Feikens' judicial supervision of the Detroit Water and Sewerage Department under a federal court order, and in part on certain statements made by the judge in the course of an interview granted to a Detroit newspaper reporter. We are not persuaded that Judge Feikens was anything other than the "neutral and detached" judicial officer required by law, and we shall affirm the convictions of both defendants.

\*     \*     \*     \*     \*     \*

During the 1970s the United States Environmental Protection Agency filed a civil action challenging the efficacy of the Detroit Water and Sewerage Department's treatment of sewage. The case was assigned to Judge Feikens. A consent judgment was entered into in September of 1977, but compliance with the judgment was unsatisfactory. By March of 1979 the department had been placed under federal court supervision, and Judge Feikens made Mayor Coleman Young the "administrator" of the department. The order of appointment gave Mayor Young extraordinary powers, including the power to bypass the Detroit City Council in awarding contracts and the power to award contracts without competitive bidding. Mayor Young informed the city council that notwithstanding these powers he would not bypass the council on contractual matters unless an emergency arose.

In July of 1979, approximately four months after the commencement of the administratorship, the department entered into a contract with Michigan Disposal, Inc., a company owned by one Michael Ferrantino, to dispose of sludge from the department's wastewater treatment plant. The award of this contract was authorized by the city council.

In January of 1980 Mayor Young appointed defendant Beckham to the position of director of the wastewater treatment plant. Sometime in the first few months of the same year defendant Bowers, a Detroit realtor and close friend of Mayor Young, invited a Mr. Jerry Owens, a clothing retailer from Mississippi, to come to Detroit and enter the sludge disposal business with herself and two white men, Sam Cusenza and Joseph Valentini. The latter two were associated with Mr. Ferrantino in the ownership of a company called Wolverine Disposal Company. By using Mr. Owens, who is black, as a front man, the other participants contemplated that they would be able to obtain city business on a preferential basis as "minority contractors." (Although

defendant Bowers is also black, her relationship with Mayor Young was apparently such as to make it imprudent for Ms. Bowers herself to fill the role envisioned for Owens.)

Pursuant to this plan, a corporate entity called "Vista Disposal" was ostensibly organized with Owens as President and nominal owner of 100% of the stock. Fifty percent of the profits of the enterprise were initially supposed to go to Cusenza and Valentini, according to the government's proofs, and 50% to Bowers and Owens. Cusenza and Valentini were to provide any necessary start-up money.

In the spring and summer of 1980 Vista submitted to the city a number of proposals for a contract under which Vista would become the city's second sludge hauler. According to the government, these proposals were "riddled with false information"; they did not reveal the true owners of Vista, they falsely claimed that Vista was incorporated and had offices in downtown Detroit, and they gave false information concerning the qualifications of Mr. Owens. One thing that Vista actually did have to recommend it, however, was access to a landfill (controlled by Wolverine) where the sludge could be dumped around the clock, seven days per week.

On August 8, 1980, Mr. Beckham notified Vista that it had been selected to present a formal proposal to the city. Four days later Owens, Cusenza and Valentini met with Mr. Beckham and city employee David Fisher. Mr. Owens testified that Fisher asked for the resumes of all principals of Vista, and that Owens submitted only his own resume, neglecting to inform Fisher of the interests of Ms. Bowers and the other silent partners. Mr. Fisher apparently was given to understand that Cusenza and Valentini were attending the meeting in their capacity as owners of Wolverine; Owens testified that he expressed a desire at the meeting to include Wolverine in the contract as part of a joint venture. (Mr. Fisher responded that this was impermissible; since the bid had been submitted in Vista's name, he explained, the contract would have to be made with Vista alone. Mr.

Fisher did say that Vista might be able to use Wolverine as a subcontractor, however.)

In September of 1980 a city attorney named Denise Page Hood began to negotiate the terms of a contract with Vista. Ms. Hood testified that Owens told her that he was the sole owner of Vista. Ms. Hood was also misled, it appears, on the subject of Vista's ability to procure a performance bond. Even though Vista attorney Charles Carson had been told that Vista could not obtain the required $250,000 bond, Mr. Carson first told Ms. Hood that Vista was in the process of obtaining a bond, and later told her that an insurance agency was qualifying Vista for a bond and would issue it within two weeks. Mr. Carson went so far as to procure and present to Hood a letter from an insurance agency that falsely stated such was the case.

Wolverine and Vista subsequently entered into a joint venture relationship, in violation of the city's requirements, and Cusenza, Valentini and Wolverine borrowed $250,000 to be used as an escrow deposit in lieu of the bond. In addition, Wolverine advanced Vista $350,000 for initial operating capital.

There was a delay in awarding the contract, and Ms. Bowers became concerned about the award. Mr. Owens testified that Ms. Bowers told him that she would contact Mr. Beckham and an aide to Mayor Young and do "everything in her power" to speed things up. During a period when the proposed Vista contract was before the city council for approval, Mr. Beckham appeared before the council several times to testify in connection with the award. According to Detroit City Councilman William Rogell, because Mr. Beckham on several occasions "wouldn't answer" questions about Vista, the councilman presented Beckham with a list of fourteen written questions regarding Vista's qualifications. A delay in answering these questions caused further consideration of the contract to be postponed until October 22, 1980. On October 20, however, the Mayor's Office summarily awarded the contract to Vista, using the extraordinary powers

granted by the district court. The stated reason was that further delay created a risk that the treatment plant would exceed its sludge storage capacity, thus causing a violation of the district court consent judgment.

According to Mr. Owens' testimony, Owens, Ferrantino, Cusenza, Valentini and Bowers thereafter met at the Vista office. According to the government's appellate brief, "Ferrantino said that Beckham had done a 'good job in helping them get things put together and that Beckham should be taken care of.' Bowers then suggested they give Beckham $1000 monthly from Vista-Wolverine and $1000 monthly from Michigan Disposal. Everyone consented." Mr. Owens testified that in November of 1980 Ms. Bowers told him she had paid Beckham his first $2,000.

Mr. Owens had previously been in trouble with federal authorities in Mississippi, and had entered into a plea agreement under which he agreed to cooperate with the government. This led to his being approached by F.B.I. agents in Detroit about cooperating in an F.B.I. investigation of the Vista situation. Owens agreed.

On December 5, 1980, Owens was fitted with a microphone and recorded a meeting with attorney Carson, Messrs. Cusenza, Valentini and Ferrantino, and Ms. Bowers. In the course of that meeting the participants agreed to deposit all monies from the Vista contract into a bank account controlled by the Vista/Wolverine joint venture, with 40% of the profits ultimately going to Wolverine, 40% to Bowers, and 20% to Owens.

Owens testified at trial that Ms. Bowers told him at a time close to January 1, 1981, that she had given defendant Beckham two more payments of $2000 each. Because Owens had not yet mastered the intricacies of his electronic companion, he failed to get a recording of this statement. On January 20, 1981, Owens tried to get a similar admission on tape. This time he succeeded; the tape captured the voice of Ms. Bowers explaining to an inquisitive Owens that she had given Beckham a total of $6000 so far.

On January 27, 1981, Owens recorded a telephone conversation and a subsequent meeting at which Mr. Beckham took a coat from Owens without paying for it. "[A] 40 regular is perfect for me," Beckham said as he admired the garment. Moments later, Beckham explained to Owens how "Mike" (Ferrantino) "took care" of "township folks" so that they would not complain about the presence of his landfill.

On February 23, 1981, Owens recorded a conversation with Ferrantino, Cusenza, Valentini and Bowers in which Ms. Bowers argued at some length that her share ought to be increased to 50%. Owens testified that in an unrecorded conversation in February, Valentini told him that he owed Ferrantino the $4000 that Valentini had used as his contribution toward bribing Beckham. On March 24, 1981, Owens recorded a conversation in which Bowers and Owens discussed renting an apartment for Beckham. Bowers said that she would subtract the rent from Beckham's "two" before she gave it to him.

Until this point all of the evidence was collected without the involvement of Judge Feikens or any other judge. By the end of March, 1981, however, the United States thought it had obtained enough evidence to justify a wiretap on Ms. Bowers' telephone—something that would require judicial approval under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. An affidavit of the United States Attorney, Richard Rossman, states that because of Judge Feikens' involvement in the operation of the Detroit Water and Sewerage Department, he and the Chief of the Detroit Strike Force Stanley Marcus informed Judge Feikens of the investigation and their plan to request authorization for electronic surveillance. Rossman's affidavit further states that he and Marcus asked Judge Feikens at this time whether the matter of getting a warrant for the wiretaps should be handled by Judge Feikens or the "miscellaneous judge." Rossman stated that he and Marcus were subsequently told by Judge Feikens that he had discussed the matter with the miscellaneous judge (the late Judge Thomas Thornton), and that the

two had agreed that Judge Feikens should "review any application to conduct electronic surveillance."

The U.S. Attorney's office then gave Judge Feikens a 101–page affidavit in which F.B.I. Special Agent Virgil Woolley set forth the evidence accumulated so far. Included in the affidavit were excerpts from the consensually recorded conversations, as well as the text of a written statement given the F.B.I. by Jerry Owens and a summary of a later interview of Owens by Agent Woolley. Judge Feikens authorized the first wiretap (on Ms. Bowers' telephone) on March 31, 1981. He authorized further wiretaps on eight subsequent dates ending with September 2, 1981.

Evidence supporting findings of probable cause for the later applications continued to mount. During April and May of 1981 there were several recorded conversations in which Bowers and Valentini discussed payments to Beckham. On May 7, for example, Ms. Bowers told Owens that she had paid Beckham $4000 for the months of April and May and that she did not like the fact that Cusenza and Valentini knew about the payoffs. In a conversation recorded at Vista's office on June 2, 1981, Owens told Bowers that he had some clothing for Beckham and also that he had won $2,300 in a golf game; Owens offered $2000 of his winnings for paying Beckham. In what the government describes as a consensual recording and videotape at the Vista office later that day, Beckham tried on the clothing. Once again, the 40 regular was a perfect fit. Beckham discussed his new apartment (financed with the monthly payoff) with Owens. As the government portrays the ensuing events:

"Bowers picked up the envelope containing $2,000 from Owens' desk and left the office. A few minutes later, Bowers reentered the office, walked over to Owens' desk and dropped the envelope in her handbag. As Owens momentarily turned his back to Beckham and Bowers while he was putting Beckham's clothing into a garment bag, Bowers reached into her handbag, brought out an envelope, and threw it to Beckham, saying 'Catch.' The envelope hit the floor in front of Beckham's seat. Beckham laughed, picked up the envelope and placed it in his inside coat pocket."

On August 4, Ferrantino and Bowers discussed the money ("the envelope") and a breakfast meeting scheduled for the next day with Beckham. FBI agents observed that meeting, which took place at a local restaurant. At the end of the meeting the agents observed Bowers handing Beckham a white envelope.

On January 8, 1982, Mr. Beckham was questioned by the FBI about Vista. He later admitted that he lied to the agents during this session.

On February 3, 1983, a federal grand jury handed up indictments charging Beckham, Bowers, Ferrantino, Valentini, and Cusenza with substantive and conspiratorial R.I.C.O. violations (18 U.S.C. § 1362(c) and (d)) and mail fraud (18 U.S.C. § 1341). In addition, Beckham was charged with violating the Hobbs Act (18 U.S.C. § 1951), and Carson was charged with mail fraud. The cases went to trial in due course, but the jury was unable to agree on a verdict and the court declared a mistrial. Valentini subsequently pleaded guilty to a R.I.C.O. conspiracy charge, Cusenza pleaded guilty to a substantive R.I.C.O. charge, and Carson pleaded guilty to a misprision of a felony. Ferrantino died before he could be retried. Defendants Beckham and Bowers were retried, and the second jury found them guilty on all counts with which they were charged.

The defendants claim that Judge Feikens lacked the neutrality and detachment necessary for proper authorization of the electronic surveillance because (1) he was so deeply involved in the treatment plant receivership that he could not deal with the criminal investigation in a clearheaded manner; (2) he had a personal dislike for the defendants; and (3) he had evidenced prejudice against persons of the defendants' race. (The only question presented is whether Judge Feikens was disqualified from authorizing the electronic surveillance; the trial itself was conducted not by Judge Feikens, but by Judge Robert De-

Mascio.) Judge DeMascio denied the defendants' motions for suppression of the electronic surveillance evidence, and we believe that he was correct in so doing.

\*    \*    \*    \*    \*    \*

Statutory law and the Fourth Amendment both require that a proper warrant be issued before federal authorities engage in non-consensual wiretaps. See *Alderman v. United States,* 394 U.S. 165, 175–80, 89 S.Ct. 961, 967–70, 22 L.Ed.2d 176 (1969). "An application for a wiretap is similar in purpose to an application for a search warrant, *i.e.,* to present sufficient information to enable a detached and neutral judicial officer to find that probable cause exists to issue the order or warrant." *United States v. Garcia,* 785 F.2d 214, 222 (8th Cir.), *cert. denied sub nom. Barker v. United States,* —— U.S. ——, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986). That the judicial officer be "neutral and detached" is essential, for judicial impartiality is basic to fair treatment under our system of jurisprudence. See *Chapman v. California,* 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 827–28 & n. 8, 17 L.Ed.2d 705 (1967).

The cases addressing the "neutral and detached" requirement fall into two primary categories. The archtype of the first is *Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927), where the Supreme Court found that the Due Process Clause of the Fourteenth Amendment would be violated by subjecting a person's liberty or property "to the judgment of a court, the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." (*Tumey* involved a mayor who received fees from alleged lawbreakers brought into a mayor's court.) See also *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (a mayor ought not act as a traffic court judge where he was responsible for raising revenue for the town and the fees collected in traffic court were a major source of town revenue); *Connally v. Georgia,* 429 U.S. 245, 250, 97 S.Ct. 546, 548, 50 L.Ed.2d 444 (1977) (paying justices of the peace $5 every time they issued a warrant, while

paying nothing when a warrant application was denied, offered " 'a possible temptation to the average man as a judge . . . or which might lead him not to hold the balance nice, clear and true between the State and the accused' " (quoting *Ward,* 409 U.S. at 60, 93 S.Ct. at 83)); *Aetna Life Insurance Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (state supreme court justice ought not participate in a case if the decision might set a precedent that would improve the justice's legal prospects in lawsuits he filed as a private citizen).

Judge Feikens had no pecuniary interest of the kind dealt with in *Tumey* and its progeny. It is true that Judge Feikens' was the court supervising the operation of the wastewater treatment plant, but the judge had no personal financial interest in that operation. In issuing authorizations for electronic surveillance, Judge Feikens was not trying to raise money for his court or for the receivership; he was simply responding to the legitimate requests of law enforcement officials who presented him with overwhelming evidence of wrongdoing.

The second line of "neutral and detached" cases stems from the reasoning of *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948), where the Court explained the policy inherent in the warrant requirement thus:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

See also *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (a state attorney general who was personally in charge of investigating a widely publicized murder, and who later acted as chief prosecutor at trial, ought not to have issued a search warrant in the

case); *Shadwick v. City of Tampa*, 407 U.S 345, 350, 92 S.Ct. 2119, 2123, 32 L.Ed.2d 783 (1972) ("Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement."); *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979) (town justice who accompanied the investigating officers to the scene of the crime to help in enforcing his open-ended warrant did not "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application for a search and seizure").

One thing that is striking about those cases is the closeness of the judicial/prosecutorial links. In *Coolidge*, the prosecutor himself issued the warrant. In *Lo-Ji*, the judge gave the police a blank check and then went to help them seize the evidence. In the case at bar, by way of contrast, Judge Feikens had no such links to the prosecution, and he did what any neutral and detached judicial officer would have done if presented with evidence of the type before him; he found that there was probable cause and issued the Title III authorizations for electronic surveillance. His actions did not, in our judgment, bring him within the proscription of the "prosecutorial involvement" line of cases.

Appellants point to the extensive involvement of Judge Feikens with the water and sewerage department receivership, but, as Judge DeMascio has noted, the Title III authorizations antedated Judge Feikens' principal involvement in the affairs of the department. It is true that the receivership had commenced before March of 1981, but the record does not show that the judge had more than a handful of occasions even to think about the receivership after its establishment and before the wiretaps were authorized. On one occasion Judge Feikens appeared before the Detroit City Council to answer criticisms and complaints involving the receivership, but the council calendar reflects that the meeting was to take only fifteen minutes. There was also an incident in 1980 where an attorney named James Canham, who had filed a state court suit regarding a collapsed sewer, was told by another attorney that the case belonged in federal court. According to an offer of proof, Canham went to Judge Feikens to discuss this and "specifically recollects Judge Feikens asking him why he brought the suit in Macomb County, when he, Judge Feikens, was the Receiver over the DWSD." About the only other pre–1981 evidence proffered by appellants was that of Joe Moore, the assistant administrator of the water and sewerage department. According to Moore's affidavit, sometime in 1979 or 1980 "Judge Feikens called me personally and asked me if I felt or knew of anything illegal going on at the wastewater treatment plant." Moore also had occasion to send Judge Feikens a letter in February of 1980 outlining the shift changes at the treatment plant; the letter apparently had something to do with union negotiations. The remaining—and much more extensive—evidence of Judge Feikens' involvement in departmental matters relates to events that took place after the Title III authorizations were issued.

The pre-wiretap authorization occurrences called to our attention by the defendants are insufficient to support a claim that Judge Feikens was biased. Not only were the actions and statements in question few and far between, but, more significantly, they all stemmed from the performance of Judge Feikens' judicial duties in the civil case. Such occurrences would not serve to disqualify him, because "a judge's alleged bias must emanate from some 'extrajudicial source' rather than from participation in judicial proceedings." *Demjanjuk v. Petrovsky*, 776 F.2d 571, 577 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986).

The defendants argue that certain language used by Judge Feikens demonstrated a deep personal identification with the the Detroit Water and Sewerage Department. The appellants went so far as to hire a linguistics professor who was prepared to testify that "it would be his expert opinion and conclusion that Judge Feikens connects and/or associates himself with the DWSD in a capacity other than that of the judge before whom the case is pending and

that Judge Feikens speaks for the system and, based upon his language, Judge Feikens considers himself and the DWSD one and the same." The professor arrived at this conclusion by looking to Judge Feikens' use of pronouns, to his failure to deny his "receivership role" when statements implying such a role were made by others, and to "a syntactically defined system of references" and "a contextually defined system of references." The government dismisses Judge Feikens' use of pronouns as nothing more than the "royal 'we,' " and denies that this shows that Judge Feikens' "identity had somehow merged with the DWSD." Whatever the merits of that debate—and without intending to suggest that there may not have been occasions following the wiretap authorizations when a somewhat more judicious and less regal use of language might have been appropriate on the judge's part—we are bound to say that we can find absolutely nothing in what Judge Feikens said before the wiretaps were authorized that could come anywhere close to justifying a reversal of the defendants' criminal convictions.

\*　　\*　　\*　　\*　　\*　　\*

■ The claim that Judge Feikens harbored some sort of personal animosity toward the defendants is likewise unsubstantiated. In a *Detroit Free Press* interview published more than three years later, Judge Feikens did say that he thought that Mayor Young had been unwise to

"choose a person like Darralyn Bowers. In a prior experience with her, she went out in Rosedale Park and tried block-busting, and there was a case in this court years before Vista in which Judge Keith presided. Darralyn Bowers was very much interested in getting these white people in Rosedale Park terror-stricken at the thought that blacks were moving in."

Judge Feikens went on to say that it was a shame that Bowers and Owens simply operated as a black front for whites associated with Ferrantino, thereby depriving blacks of an opportunity to receive the benefits of the jobs to be had and skills to be learned in the sludge hauling business.

In context, and given the amount of water that had gone over the dam between the time of the wiretap authorizations and the time of the interview, these statements have little probative value. They hardly demonstrate that Judge Feikens based his decision to authorize the wiretaps on anything other than the very strong evidence of serious wrongdoing presented by the U.S. Attorney.

Mr. Beckham makes much of the proffer of testimony by Assistant Administrator Moore. Moore would have testified that in the summer of 1981 he suggested that the position he held be combined with that held by Beckham. Judge Feikens' response was "Not that fellow Beckham." Moore, taken aback, did not respond. According to Moore, Judge Feikens then added, "You know these people have to be led."

What Mr. Beckham ignores is that this conversation took place at a time when Judge Feikens was seeing monthly reports on Mr. Beckham stuffing cash-filled envelopes into his pockets. That the judge was not enthusiastic about giving greater responsibility to a man he knew to be a crook hardly requires explanation, whatever one may think of the judge's notion that people like Mr. Beckham, who is black, "have to be led"—presumably by people who, like the judge, are not.

Our conclusion is in no way impaired by the holding in *Offutt v. United States,* 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954), where a "clash" between the trial judge and counsel for a criminal defendant "colored the course of the trial" and carried "increasing personal overtones." At the close of trial in *Offutt,* the judge summarily found defense counsel in criminal contempt under Fed.R.Civ.P. 42(a). The Supreme Court ordered that the criminal contempt charge be reheard by a different judge. The "vital point," according to the Court, was "that in sitting in judgment on such a misbehaving lawyer the judge should not himself give vent to personal spleen or respond to a personal grievance." *Id.* at 14, 75 S.Ct. at 13.

Nothing in the record in the case at bar indicates the sort of personal animosity found in *Offutt.* Almost every alleged in-

dication of hostility toward the appellants in this case came after the time the Title III authorizations were issued—by which time, as we have noted, Judge Feikens had learned of the appellants' criminal activity.

Finally, we must advert to certain additional statements made by Judge Feikens in the *Detroit Free Press* interview referred to above. Those statements, described in detail in our opinion in *In re City of Detroit, Detroit Water and Sewerage Department,* 828 F.2d 1160 (6th Cir.1987), lend themselves to the interpretation that the judge, although obviously sympathetic toward black people, tended to patronize them. Publication of the article led to the filing of several complaints with the Sixth Circuit Judicial Council, but the council declined to reprimand the judge for his remarks. Impolitic though the statements may have been, we can find in them no indication whatever that the Title III wiretap authorizations issued more than three years earlier were based on anything other than the strong showing of wrongdoing presented to the judge by the government prosecutors.

By March 31, 1981, there was ample evidence of probable cause. The consensually recorded conversations[1] and the statements of Jerry Owens showed that bribes were being passed; this evidence was more than enough to persuade any neutral and detached judicial officer that electronic surveillance was appropriate.[2] If someone other than Judge Feikens had heard the Title III applications, the result would have been precisely the same.

The judgment of the district court is AFFIRMED.

---

1. "Neither the Constitution nor any Act of Congress requires that official approval be secured before conversations are overheard or recorded by Government agents with the consent of one of the conversants." *United States v. Caceres,* 440 U.S. 741, 744, 99 S.Ct. 1465, 1467, 59 L.Ed.2d 733 (1979).

2. This disposes of a minor argument of appellants, that a district court rule was violated when Judge Feikens handled the warrant applications instead of the "miscellaneous judge," the

late Judge Thomas Thornton. This court has held that "[e]ven when there is an error in the process by which the trial judge is selected, or when the selection process is not operated in compliance with local rules, the defendant is not denied due process as a result of the error unless he can point to some resulting prejudice." *Sinito v. United States,* 750 F.2d 512, 515 (6th Cir.1984). See also *United States v. Gallo,* 763 F.2d 1504, 1532 (6th Cir.1985).